# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

STACI BARBER,                                              )
                                                          )
     Plaintiff,                                 )
                                                          )
vs.                                                       )    CIVIL ACTION NO. 4:24-CV-01004
                                                          )
KATY INDEPENDENT SCHOOL DISTRICT;                         )
BRYAN SCOTT ROUNDS, Principal of Cardiff                  )    **Oral Argument Requested**
Junior High, sued in his individual and official          )
capacities,                                               )
                                                          )
     Defendants.                                )

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Staci Barber files this motion for partial summary judgment as to liability on Counts I and II of her Verified Complaint: violations of the Free Speech and Free Exercise Clauses of the First Amendment. The undisputed facts of the record establish that Katy Independent School District ("Katy") and Bryan Scott Rounds, the Principal of Cardiff Junior High ("Cardiff"), violated Barber's First Amendment rights by relying on a Katy Policy to prohibit her from praying where students might see her and she is entitled to judgment on liability as a matter of law.

In support of her motion, and with the exception of one exhibit, Plaintiff relies on record evidence previously submitted by the parties to the Court.

## STATEMENT OF UNDISPUTED FACTS

Staci Barber, a math teacher at Cardiff, has taught there since 2015. Doc. #1 ¶ 9 (Verified Complaint). Principal Rounds is her supervisor and principal. Doc. #17, Ex. 1 at 2 (Rounds Declaration). *See You at the Pole* ("SYATP") occurs on the fourth Wednesday of September when

millions of people around the country gather at school flagpoles to engage in prayer and religious activity before the school day begins. *Id.* Barber has participated in this event and prayed at the pole on SYATP for as long as she has been a teacher at Cardiff. Doc. #1 ¶ 17.

Prior to SYATP 2023, Principal Rounds sent an email to Cardiff staff on September 26, 2023, at 1:55 PM. Doc. #17, Ex. 1 at 6. This email told employees that "Per School Board policy FNAB(Local), district personnel shall not promote, lead, or participate in the meetings of non-curriculum-related student groups." *Id.* The email went on to cite the language from the employee handbook at issue in this case, "Board Policy prohibits staff members from leading students in prayer or praying with or in the presence of students," *id.*, and quoted the following language from the Katy Employee Handbook:

> The District is committed to the constitutional principle of separation of church and state. Board Policy makes it clear that employees will neither advance nor inhibit religion. **Employees may not pray with or in the presence of students.** However, nothing prevents a teacher or other employee from praying or reading religious materials during a time when students are not present. If a group of employees wishes to pray together, read the Bible, or engage in some other religious activity, they may do so as long as the activity does not interfere with their duties or the rights of other employees or students.

*Id.* (emphasis added).

No specific student group had been approved to pray at the pole at the time of this email. Only after prohibiting all teachers from praying publicly did Rounds then authorize the Fellowship of Christian Athletes ("FCA") to meet and pray. *Id.* at 11. The email instructing employees that Board Policy prohibits prayer in the presence of students was routine for Rounds, who had "sent the same (or similar) communications annually in [his] role as Principal, as well as when [he] was Associate Principal at Katy High School." *Id.* at 2. Rounds told his staff that he sent this email "per Katy ISD policies and procedures." *Id.*

Rounds allowed FCA students to meet and pray at the pole on SYATP, September 27, 2023. *Id*. at 2-3. Barber believed that the students would not be praying at the pole until 8:20 am, Doc. #1 ¶ 19, since student classes did not start until 8:40 am. Doc. #8, Ex. 2 at 21 (2023-24 Employee Handbook). Barber sent an email to other staff members, inviting them to gather and pray together at the pole at 8:00 am, before their workday began at 8:20 am, and well before FCA students prayed at the pole. Doc. #17, Ex. 1 at 26-27.

On September 26, 2023, at 5:06 PM, Rounds responded directly to Barber's email specifically prohibiting her from praying:

> Per the email that I sent earlier today (attached), per district School Board policy, employees CANNOT pray with or in the presence of students.  You cannot have a student group AND staff group both praying at the pole as this would be a violation of Board policy.  See You At The Pole is a student-initiated event (not staff initiated) and student-let event (not staff led).  **Even though it is before the school day, you are on campus visible to students in your role as an employee.**

*Id*. at 24-25 (emphasis supplied). Rounds's email specifically cited Board Policy to restrict Barber's praying in front of students when the students can see her praying. *Id*. at 25. Barber responded by clarifying that she had no desire to pray while students are present doing so: "There will be no kids when we are out there." *Id*. at 24.

Since the workday for teachers at Cardiff officially begins at 8:20 am, Doc. #8, Ex. 2 at 21, Barber met with one other teacher to pray at 8:05 am at the school flagpole on September 27, 2023. Doc. #1 ¶ 25. Two more teachers joined her at the pole to pray at approximately 8:10 am. *Id.*; Doc. #17, Ex. 1 at 3.  While they were praying, Rounds called them to step into the conference room. Doc. #1 ¶ 26. Rounds's stated reason for this meeting was "to stay in compliance with district policy and procedures." Doc. #17, Ex. 1 at 3. At the time of this conduct, Rounds claimed "[t]here were students near the front entrance of the school, but students had not yet started gathering at the pole." *Id.*

With his knowledge, Barber recorded the meeting with Rounds. *Id*.; Doc. #20, Ex. 1 at 2. Rounds told the teachers that they cannot pray in front of or in the presence of students, specifically stating as follows:

> in your role as educators and teachers with Katy ISD, you cannot pray in the presence of students, right? You do have the right to pray privately during like break time, before school, after school. You can get together and pray together in -- in private, away from students. But you cannot do that in front of students[.]

Transcript, attached hereto as Ex. A., at 2:3-9.[1] Rounds made it abundantly clear:

> That's part of board policy. And what's going to happen is if you start, kids are going to come over -- some kids are probably going to come over and want to join you. And so when you -- when you do that, you're in violation of board policy.

*Id*. at 2:12-16.

Rounds explicitly told the teachers that the Katy policy does not allow them to pray in front of students and categorically forbade them from praying in any location where students would be present. *Id.* at 2:3-18. Barber responded by asking if they should go to a different location to pray instead: "So do you want us to go to the parking lot?" *Id*. at 3:1-2. Rounds refused to let them pray in the parking lot or anyplace where students gathered: "So you have the right to pray in private, but -- but not in front of students. And there are students at the front and you -- so you can't do that." *Id*. at 3:3-6.

## **LEGAL STANDARD**

To obtain summary judgment, a movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The summary judgment movant bears the burden of proving that no genuine issue of material fact

---

[1] A preliminary transcript, generated by an Amazon transcription service, was previously filed with the Court in support of Plaintiff's motion for a preliminary injunction. Doc. #20, Ex. 2. The transcript attached hereto was generated by a court reporter.

exists." *Am. Comp. Ins. Co. v. Ruiz*, 2023 U.S. App. LEXIS 27117, at *8 (5th Cir. Oct. 12, 2023). Once the movant meets its initial burden, the non-movant must then demonstrate the existence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the non-movant bears the ultimate "burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. . . . Rather, the summary judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting the non-movant's case." *Am. Comp. Ins. Co.*, 2023 U.S. App. LEXIS 27117, at *8 (citation omitted). Here, Defendants ultimately bear the burden to justify their conduct. *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.") (citations omitted).

## ARGUMENT

Last May, this Court denied a preliminary injunction, based solely on the element of irreparable injury. Doc. #25 at 4 ("Because the Court finds that Plaintiff has not demonstrated irreparable harm, as discussed in detail below, the Court only addresses this factor."). The Court did not address the merits. Regardless of the scope of Katy's current policy, the religion policy Rounds enforced against Barber prohibited prayer in the presence or in front of students, i.e., anywhere they might see her. The application of this policy violated Barber's clearly established First Amendment rights as a matter of law.

The First Amendment right to speak freely on public issues does not disappear merely because one is a public employee. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022). "The theory that public employment which may be denied altogether may be subjected to any conditions regardless of how unreasonable, has been uniformly rejected." *Pickering v. Bd. of Ed.*

*of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 605-06 (1967)). The doctrine that an adverse employment action against a public employee may violate the First Amendment right to free speech and free exercise is not novel, nor does it originate in *Kennedy*. Instead, it is a long-standing principle, commonly known as the *Pickering* doctrine, that has protected public employees in all manner of cases.

## I.    Katy ISD Violated Barber's First Amendment Rights

Four elements exist to determine whether a public employee's First Amendment rights have been violated: "(1) the employee must suffer an adverse employment decision; (2) the employee's speech must involve a matter of public concern; (3) the employee's interest in commenting on matters of public concern must outweigh the defendant's interest in promoting efficiency; and (4) the employee's speech must have motivated the employer's adverse action." *Oscar Renda Contr., Inc. v. City of Lubbock*, 577 F.3d 264, 271 (5th Cir. 2009). Additionally, in order for a municipality to be liable, an official must act according to policy or custom. *Monell v. N.Y. City Dept. of Soc. Servs.*, 436 U.S. 658 (1978).  As more fully detailed below, the facts of this case uncontrovertibly meet the four elements of a First Amendment violation such that partial summary judgment on the issue of liability should be granted.

### A.    Rounds and Katy ISD took Adverse Action Against Barber

The "discipline" requirement for a First Amendment claim brought by a government employee is not a high bar; instead, a plaintiff must show that he or she experienced an adverse employment decision. *Howell v. Town of Ball*, 827 F.3d 515, 522 (5th Cir. 2016).  Specifically, in order to allege a First Amendment claim, one need only "allege adverse acts that 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Morris v. Powell*, 449 F.3d 682, 685-86 (5th Cir. 2006) (quoting *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir.

1996) (en banc), vacated on other grounds, 523 U.S. 574 (1998)); *see also Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002). As the Sixth Circuit has emphasized, "[t]he adverse-action standard for First Amendment retaliation claims is different from the adverse-employment-action standard for Title VII claims.'" *Harper v. City of Cleveland*, 781 Fed. Appx. 389, 396 (6th Cir. 2019) (quoting *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014)).

The First Amendment protects public employees from even "trivial" adverse actions against them. *Rutan v. Republican Party*, 497 U.S. 62, 75 n.8 (1990). The Supreme Court has emphasized that "the First Amendment . . . protects state employees not only from patronage dismissals but also from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights.'" *Id.* (citation omitted). The First Amendment protects public employees from having their First Amendment rights chilled, and if any action is taken against them because of their exercise of their rights, they have the right to seek redress for that constitutional injury. The Fifth Circuit is clear: "[a]dverse employment decisions include 'discharges, demotions, refusals to hire, refusals to promote, and reprimands.'" *Juarez v. Aguilar*, 666 F.3d 325, 332 (5th Cir. 2011) (citation omitted); *see also Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000).

The material facts here are undisputed. Rounds ordered Barber to stop her prayer and to meet with him. He then ordered her to cease her religious activity, reprimanding her for her conduct. When Barber asked to pray in the parking lot, Rounds told her "you can't do that." Ex. A at 3:5-6. In response to her prayer where students could see her, he warned her that "when you do that, you're in violation of board policy. I try to be as clear about that and as -- as sensitive about that as possible." *Id.* at 2:15-17. Rounds prohibited Barber from engaging in her religious conduct, banning her from even praying in the parking lot, and made it very clear that he was enforcing

Katy policy as a mandatory obligation for the employees he supervises—a directive she has complied with ever since because of his warning not to engage in similar conduct. This is an adverse action, a "reprimand" according to *Juarez*, 666 F.3d at 332. Such a reprimand suffices to proceed with a First Amendment claim, as it constitutes an adverse act that chills Barber's First Amendment rights. Barber need not violate the policy again and be disciplined more harshly in order to challenge what happened to her.

### B.    Barber Prayed at the Pole as a Private Citizen and Not as an Employee.

By engaging in private prayer before the school day began, Barber spoke as a citizen and not as an employee. The Fifth Circuit has provided several non-exclusive factors to determine whether an employee spoke as a private citizen: the courts consider "factors such as job descriptions, whether the employee communicated with coworkers or with supervisors, whether the speech resulted from special knowledge gained as an employee, and whether the speech was directed internally or externally." *Johnson v. Halstead*, 916 F.3d 410, 421 (5th Cir. 2018) (citation omitted). The "key" factor is "whether the speech was directed internally within the organization or externally to the public. *Rushing v. Miss. Dep't of Child Prot. Servs.*, 2022 U.S. App. LEXIS 7797, at *7 (5th Cir. 2022). "An employee who speaks to listeners outside the employee's organization about issues unrelated to her job duties generally speaks as a citizen." *Id.*

Barber spoke on a matter of public concern; her prayer was directed outside her organization, to her God, and not in any way directed toward her employer. The Supreme Court has defined "a matter of public concern" as one that "relat[es] to any matter of political, social, or other concern to the community." *Connick v. Meyers*, 461 U.S. 138, 146 (1983). "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that

is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quotations and citation omitted). Prayer and religious activity, particularly in this context, i.e., prayer outside a school building on behalf of that school for the upcoming school year, is a matter of public concern. *See Kennedy*, 597 U.S. at 528. Because Barber's speech concerns religion, it is "unquestionably of inherent public concern." *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011); *see also Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996) ("[T]he speech is religious expression and it is obviously of public concern."); *see also Shatkin v. Univ. of Tex. at Arlington*, 2009 U.S. Dist. LEXIS 18018, at *14 (N.D. Tex. 2009) (noting that prayer "certainly can be of public concern").

"The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240. Here, all the factors used to determine whether Barber spoke as a private citizen weigh heavily in her favor. By praying at the school flagpole before the school day began, Barber was not acting pursuant to her employment. Barber offered her prayer not as a government actor, but in her capacity as a private citizen and on her personal time.

As previously briefed by Plaintiff, the Supreme Court's analysis in *Kennedy*, 597 U.S. at 530, dispositively resolves this case. *See, e.g.*, Doc. #8 at 12. In *Kennedy*, a school district disciplined and ultimately fired a football coach for praying on the field after weekly football games. The Court concluded, "Mr. Kennedy has demonstrated that his speech was private speech, not government speech" because when he prayed, "he was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech the District paid him to produce as a coach." *Id.* at 530-31. As the Court explained further,

> During the postgame period when these prayers occurred, coaches were free to attend briefly to personal matters—everything from checking sports scores on their

phones to greeting friends and family in the stands. We find it unlikely that Mr. Kennedy was fulfilling a responsibility imposed by his employment by praying during a period in which the District has acknowledged that its coaching staff was free to engage in all manner of private speech. That Mr. Kennedy offered his prayers when students were engaged in other activities like singing the school fight song further suggests that those prayers were not delivered as an address to the team, but instead in his capacity as a private citizen. Nor is it dispositive that Mr. Kennedy's prayers took place "within the office" environment—here, on the field of play. *Garcetti*, 547 U.S., at 421. Instead, what matters is whether Mr. Kennedy offered his prayers while acting within the scope of his duties as a coach. And taken together, both the substance of Mr. Kennedy's speech and the circumstances surrounding it point to the conclusion that he did not.

*Id.* at 530. During the time that Coach Kennedy prayed on the field, other members of the coaching staff were permitted to do things like visit with friends or take personal phone calls. The school made no attempt to regulate any of the conduct by other members of the coaching staff and, as such, it was clear that Coach Kennedy was acting in his personal capacity. *Id.* at 527. The Kennedy rationale applies even more directly in this case where Barber's prayer occurred completely outside the scope of her work responsibilities. Since Katy official school policy starts Barber's workday at 8:20 am, Doc. #8, Ex. 2 at 21, her prayer occurred well outside the scope of her employment.

As confirmed by Katy's correspondence, nothing about Barber's "ordinary job responsibilities" required her to pray at the pole. The policy at issue forbade Barber from praying where students might see her; thus, her prayer was not within her job duties and fell outside her employment. *See Dahlia v. Rodriguez*, 735 F.3d 1060, 1075 (9th Cir. 2013) ("[W]hen a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties. Indeed, the fact that an employee is threatened or harassed by his superiors for engaging in a particular type of speech provides strong evidence that the act of speech was not, as a 'practical' matter, within the employee's job duties.").

Barber's prayer was not made through the chain of command or aimed at others within her place of employment. This lack of internal communication is "key." *Rushing*, 2022 U.S. App.

LEXIS at *7. Barber did not target her prayer at any employer or make it an internal communication. Barber prayed directly to her God in her capacity as a private citizen. Barber's prayer did not reference any special knowledge that she had received from her employment and did not give anyone the impression that it occurred with the official permission of Katy ISD. The fact that people would have known that she was an employee does not mean she was acting officially. Merely "identifying oneself as a public employee does not forfeit one's ability to claim First Amendment protections." *Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 737 (5th Cir. 2015).

Just as the coach in *Kennedy* exercised a constitutionally protected right to engage in religious activity when he prayed at the 50-yard line, Barber exercised her constitutionally protected right when she prayed at the flagpole before her workday began. Any possible justification that might have supported the school's discipline of the coach in *Kennedy*, such as the fact that his speech occurred while he was on the clock, is not present here. Because Barber's religious expression is clearly outside the scope of her employment duties, she spoke as a citizen, not as a public employee. Her speech therefore "lies at the heart of the First Amendment." *Lane*, 134 S. Ct. at 2377.

### C. The *Pickering* Balancing Test Favors Barber.

Under well-established precedent, if a court finds the employee has made statements that are within the scope of First Amendment protection, the court must then "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [school district], as an employer, in promoting the efficiency of the public services it performs through its employees." *Graziosi*, 775 F.3d at 740 (citing *Pickering*, 391 U.S. at 568).

Barber's speech did not interfere with her ability to perform her job duties in any way, as

it occurred entirely outside the scope of those duties. No concern existed over the "efficiency of the public services" with respect to her speech. Barber's prayer was outside the scope of her duties and before the beginning of the workday. It was just as much outside the scope of her duties as her private religious activity at home. She was prepared to, and did, begin her employment when the workday began at 8:20 am and after this period of prayer. Defendants cannot demonstrate how off-duty prayer before the workday begins would have any detrimental effect on the performance of Barber's employment tasks. "As the Supreme Court has made clear, . . . the relevant issue is not the weight of the governmental interest considered in abstract terms; we look instead to how the speech at issue *affects* the government's interest in providing services efficiently." *Kinney v. Weaver*, 367 F.3d 337, 362 (5th Cir. 2004) (en banc) (emphasis in original). For a court to find that the government's interest in a "smoothly-running" workplace "outweighs" an employee's First Amendment rights, "defendants must demonstrate actual, material and substantial disruption, or reasonable predictions of disruption in the workplace." *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009) (internal quotation marks omitted).

The evidence in this case clearly establishes Katy ISD violated Barber's First Amendment Right to Free Speech. Rounds's affidavit fails to demonstrate any facts to support that Barber acted to disrupt or interfere with others when she prayed on her own time. Katy's purported interest here is primarily the Establishment Clause and a concern to avoid any entanglement between the religious activity of a teacher and that of students. No facts support this assertion.

As Rounds admitted in his declaration, "[t]here were students near the front entrance of the school, but students had not yet started gathering at the pole" when Barber prayed at the flagpole. Doc. #17, Ex. 1 at 3. Rounds knew students were not present but continued to insist that students might see Barber praying, stating:

> If -- if this student group -- this young man said he had some friends and they were planning to -- to do the -- the prayer at the pole, if they show up and they're there and you're, you're present with them, like, what -- what message are you sending?

Ex. A at 5:16-21. Even though Barber made clear to Rounds that her speech would not interfere with the gathering of a student group (*see id*. at 5:22-23; Doc. #17, Ex. 1 at 24) and Rounds acknowledged that students had not yet begun meeting to pray (Ex. A at 5:16-21), Rounds ordered Barber to cease praying—his concern being that the students would eventually come to school and *might* witness Barber praying. Not only was Barber emphatic that she would not continue praying when students arrived, Barber had made the same point in her emails before the event. She emphasized that "It is only for staff before students arrive just like we have done the past three years" and "There will be no kids when we are out there." Doc. #17, Ex. 1 at 24. Barber even offered to relocate to the parking lot to pray but Rounds continued to refuse the suggested alternative. Without question, Katy's conduct violated Barber's First Amendment rights with no factual basis to assert that her conduct interfered with her employment.

The Katy policy on September 26, 2023, did not prohibit prayer solely while students participated in a group event, *it prohibited all prayer by staff when students were present*. Rounds made that clear in his email by saying, "[b]y 8:00 AM students are generally waiting at the front entry of the building." Doc. #17, Ex. 1 at 24. On September 26, 2023, Rounds made clear to Barber and other teachers that Katy Policy meant *no prayer in the presence of or in front of students*. Rounds refused to let them pray in the parking lot either, where no students were gathering or scheduled to gather, saying "So you have the right to pray in private, but -- but not in front of students. And there are students at the front and you -- so you can't do that." Ex. A at 3:3-6. There is no allegation in the record that the parking lot was reserved for a student event or that some student group was gathering there. Instead, Rounds was simply applying what the policy said, i.e.,

no prayer in the presence of students, and forbidding Barber and her fellow teachers from praying anywhere students might see them.

In *Kennedy,* the Supreme Court categorically rejected the lower court's assertion that everything a teacher or coach says in the workplace is government speech that is subject to government control. Such a misinterpretation would improperly allow a school to "fire a Muslim teacher simply for wearing a headscarf or prohibit a Christian aide from praying quietly over her lunch in the cafeteria." *Kennedy*, 597 U.S. at 531. Quiet prayer in a cafeteria, which the Court took assumed as being protected, is of course prayer in the presence of students. It also rejected the school's claim that the First Amendment does not permit "an employee, while still on duty, to engage in religious conduct." *Id.* at 526. *Kennedy* left no doubt in categorically rejecting such an argument:

> Such a rule would be a sure sign that our Establishment Clause jurisprudence had gone off the rails. In the name of protecting religious liberty, the District would have us suppress it. Rather than respect the First Amendment's double protection for religious expression, it would have us preference secular activity. Not only could schools fire teachers for praying quietly over their lunch, for wearing a yarmulke to school, or for offering a midday prayer during a break before practice. Under the District's rule, a school would be required to do so. It is a rule that would defy this Court's traditional understanding that permitting private speech is not the same thing as coercing others to participate in it.

*Id.* at 540. In short, the Supreme Court in *Kennedy* emphatically rejected the notion that public school employees can be prohibited from praying publicly.

### D.    The Reprimand Barber Received was for her Religious Activity.

It is undisputed that Barber was reprimanded and ordered to stop her religious activity, prayer. That reprimand was specifically because of that religious activity, not any other conduct, and she was ordered to cease from engaging in it.

### E.    This Reprimand was Pursuant to Katy ISD Policy.

As policymaker, Katy ISD is liable if its policy is unconstitutional. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004). An official policy may take "various forms," including "a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009) (citation omitted). Municipal policy may consist of

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992).

In its ruling on the preliminary injunction motion, this Court noted that Defendants applied their policy by ordering Barber not to pray where students could see her: "Principal Rounds responded to Plaintiff's September 25 email and informed her that, per KISD's policy, employees cannot pray 'with or in the presence of students.'" Doc. #25 at 2. In so ruling, this Court recognized the undisputable fact that KISD's "no prayer in front of students" language within its employee handbook constituted a policy subject to constitutional scrutiny. Likewise, in ruling on Defendants' motion to dismiss, the Court found "that Plaintiff has sufficiently alleged that her constitutional rights were violated in accordance with an official policy that was promulgated or ratified by the KISD Board." Doc. #34 at 11. The evidence now confirms that conclusion.

The *Monell*[2] "policy or custom" requirement does not arbitrarily limit liability only to formally propagated policies; it is instead designed merely to ensure that a municipality is "held liable under § 1983 only for its own violations of federal law." Liability can be imposed on a municipality for its "policy or custom" that is "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," for "deprivations visited pursuant to governmental 'custom' **even though such a custom has not received formal approval through the body's official decision making channels**," *Los Angeles County v. Humphries*, 562 U.S. 29, 36 (2010) (emphasis added ). Applying the rationale of *Monell* to this case, the religion language contained in the Katy ISD Handbook, which categorically prohibits prayer in the presence of students, was customarily applied by Rounds in his role as the principal of Cardiff.  Rounds repeatedly quoted the handbook language in emails and orally to Barber thus binding Katy ISD through its "usage and practice." *See Monell*, 436 U.S. at 690-91.

Rounds repeatedly represented to Barber that he was enforcing Katy ISD Policy by enforcing the no-prayer-in-the-presence-of-students requirement at issue here. First, he indicated to Cardiff staff that "Board Policy prohibits staff members from leading students in prayer or praying with or in the presence of students." Doc. #17, Ex. 1 at 12. Second, Rounds specifically told Barber "per district School Board policy, employees CANNOT pray with or in the presence of students." *Id*. at 25. Rounds could not have been clearer that he was applying Katy ISD policy. Third, in his declaration, Rounds reiterated five times that this prohibition of prayer in the presence of students was an application of "district Policies and Procedures.":

---

[2] 436 U.S. 658 (1978). Local governing bodies (and local officials sued in their official capacities) can be sued directly under § 1983 for monetary, declaratory, and injunctive relief in those situations where the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy.

1. "My goal in the communication was to make staff aware that SYATP is allowable, but that there are certain requirements that students and staff must adhere to *per Katy ISD policies and procedures*." Doc. #17, Ex. 1 at 2.

2. "In order to avoid staff and students mixing at the event and to stay *in compliance with district policy and procedures*, I stepped out of the conference room door and asked the three teachers if they would step into the conference room." *Id*. at 3.

3. "I have never interfered or impeded with the right of my staff members to pray at the workplace, *in compliance with district policy and procedures*." *Id*.

4. "I have never prohibited or even insinuated that Ms. Barber cannot pray or engage in Bible study at school, *in compliance with district policy and procedures*." *Id*. at 4.

5. "I have only acted in good faith *to apply the district policy and procedures* regarding the mixing of staff and students in prayer." *Id*.

As Rounds reiterated to Barber, "That's part of board policy.  And what's going to happen is if you start, kids are going to come over -- some kids are probably going to come over and want to join you. And so when you -- when you do that, you're in violation of board policy."  Ex. A at 2:12-16. *Defendants* acknowledged to this Court that the religion language within the handbook is, in fact, a policy.

Moreover, the employee handbook bears the "official imprimatur" of Katy ISD on its cover. The Katy ISD's Employee Handbook states that "it is a guide to and a brief explanation of District policies and procedures related to employment." Doc. #8, Ex. 2 at 9. It also clearly identifies itself as being part of Board Policy, with the statement, "[t]he District is committed to the constitutional principle of separation of church and state. Board Policy makes it clear that employees will neither advance nor inhibit religion." Doc. #17, Ex. 1 at 6.  At a minimum, such facts "give[] rise to a reasonable inference that the statement 'can be fairly identified as' an action 'of the government itself.'" *Robinson v. Hunt County*, 921 F.3d 440, 449 (5th Cir. 2019) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). No "magic word" exists to create a policy; even an

official social media post on behalf of the government can constitute an official "policy" for purposes of *Monell. See St. Maron Props., L.L.C. v. City of Houston*, 78 F.4th 754, 758 (5th Cir. 2023).

As applied to this case, anyone reading the Katy ISD Employee Handbook would be left with no other impression then that its contents contain Katy ISD policy. Courts regularly consider employee handbooks as strong evidence of official government policy. *See Reyna v. Idea Pub. Schs*, 2021 U.S. Dist. LEXIS 176500, at *14 (S.D. Tex. Feb. 22, 2021) ("[H]andbook" constituted a "policy of not providing notice of nonrenewal of a term contract."); *Smith v. Meridian-Lauderdale Cty. Pub. Library,* 2019 U.S. Dist. LEXIS 18007, at *4 (S.D. Miss. Feb. 5, 2019) ("[H]andbook may be evidence of a type of § 1983 violation."); *Ming v. City of Rochelle, Ill.*, 91-cv-20229, 1992 U.S. Dist. LEXIS 7660, at *9 (N.D. Ill. May 15, 1992) (A municipality "set the official policy regarding due process rights of employees in the collective bargaining agreement and employee handbook.").

Moreover, a custom suffices to support *Monell* liability. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011). A custom gives rise to liability if the practice is "so persistent and widespread as to practically have the force of law." *Id.*; *see also Nehad v. Browder*, 929 F.3d 1125, 1141 (9th Cir. 2019) ("[E]vidence of an informal practice or custom will suffice."). The Katy ISD employee handbook binds all employees and unequivocally operated as a custom with "the force of law." Principal Rounds emphatically referred to the handbook language as binding policy, repeatedly treated it as a Katy ISD policy, and most certainly relied on it to enforce "no prayer in front of students." Its operation and customary enforcement against Barber support granting partial summary judgment on the issue of liability.

## II.    Rounds is Not Entitled to Qualified Immunity.

The standard for qualified immunity is "that in the light of pre-existing law the unlawfulness must be apparent." *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citations omitted). Public officials are immune from damages for claims brought against them in their individual capacity so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). At no time has case law affirmed that teachers may not pray if a chance exists that they will be seen by students, nor does caselaw exist that a teacher can be stopped from praying in a parking lot because a student might see him or her praying. To the contrary, since *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), the Supreme Court has emphasized that "teachers [do not] shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."

The facts detailed above unequivocally demonstrate that Rounds told Barber not to pray anywhere a student might see her doing so. Rounds relied on Katy ISD policy to enforce his directive on September 26, 2023. No question of fact exists to dispute that the Supreme Court's ruling in *Kennedy*, 597 U.S. at 542 must apply to grant Plaintiff Barber partial summary judgment. As this Court recognized in its ruling on the motion to dismiss: "*Kennedy* serves as an on-point case that clearly establishes that it is a violation of the First Amendment for a school to instruct its employee that she cannot pray in the presence of students." Doc. #34 at 9.

Like Coach Kennedy, Barber was engaging in personal, private prayer, but was ordered to stop because that prayer constituted "demonstrative religious activity." *Kennedy*, 597 U.S. at 540. Just as the school in *Kennedy* argued "that any visible religious conduct by a teacher or coach should be deemed—without more and as a matter of law—impermissibly coercive on students,"

19

*Id.*, so too did Katy ISD through Principal Rounds dictate Barber's act of prayer in front of students violated "its policy." A teacher's personal "demonstrative religious activity" is protected by the First Amendment from infringement, and that specific holding applies to Barber. *Id.* On September 26, 2023, Barber had a right to engage in personal private prayer and not be barred from doing so just because a student might see her. Rounds's conduct in enforcing Katy ISD policy to ban her prayer on a chance she would be seen violated Barber's First Amendment right to Free Speech and Free Exercise and partial summary judgment should be granted.

## CONCLUSION

For these reasons, Plaintiff Staci Barber respectfully requests that the Court grant her partial summary judgment on Counts I and II of her Verified Complaint.

Dated:  April 8, 2025                              Respectfully submitted,

/s/ Brett B. Stalcup                                /s/ Nathan J. Moelker
BRETT B. STALCUP                             NATHAN J. MOELKER*
(Tex. Bar. 19011800; S.D. Tex. Bar 3710517)   (VA Bar No. 98313)
STALCUP LAW                                     CHRISTINA A. STIERHOFF*
3811 Turtle Creek Blvd. Suite 175              (D.C. Bar No. 1657929)
Dallas, Texas 75219                             GEOFFREY SURTEES*
Telephone: (214) 219-1000                       (KY Bar No. 89063)
Facsimile: (214) 219-1003                       ELGINE H. MCARDLE*
Email: bstalcup@stalcuplaw.com                 (WV Bar No. 6249)
                                                AMERICAN CENTER FOR LAW AND
                                                JUSTICE
                                                201 Maryland Avenue, NE
                                                Washington, D.C.  20002
                                                Telephone: (202) 546-8890
                                                Facsimile: (202) 546-9309
                                                Email: nmoelker@aclj.org

                                                **COUNSEL FOR PLAINTIFF**

        *Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby affirm that a true and correct copy of the foregoing document was served upon all counsel of record through the Court's e-filing system on April 8, 2025.

<u>/s/ Elgine H. McArdle</u>
ELGINE H. MCARDLE*
Counsel for Plaintiff

*Admitted Pro Hac Vice